```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
RUDOLPH J. LOWY,                     :
                                     :
            Plaintiff,               :     04 Civ. 9931 (JSR)
                                     :
         -v-                         :     MEMORANDUM ORDER
                                     :
JOSEPH BOBKER                        :
                                     :
            Defendant.               :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

On March 22, 2005, the Court signed a consent order confirming that defendant owes plaintiff $943,537.37 as of February 10, 2005 (with post-judgment interest continuing to run thereafter), as a result of a judgment plaintiff won against defendant in California state court on May 10, 2001. See Order, 3/22/05. Plaintiff then moved to compel defendant to make installment payments on this debt. In addition to receiving written submissions, the Court held an evidentiary hearing on June 1, 2005, at which fact witnesses Joseph Bobker, Eli Bobker, and Ben Bobker and expert witnesses Alan C. Winters and Mitchell R. LaBar testified.

For the following reasons, the Court now grants the motion and orders defendant to make installment payments to plaintiff in the amount of $8,333 per month until the judgment (including interest) is fully satisfied.

The pertinent facts, as hereby found by the Court, are as follows:

Defendant Joseph Bobker, trained as an architect, has had a long and prosperous career in the real estate industry, initially in

Australia. Affidavit of Joseph Bobker, 7/18/03 ("Joseph Bobker Aff."), attached to Declaration of Paul J. Hyams, 2/17/05 ("Hyams Decl.") as Exhibit F, ¶ 4. In 1980, he moved to Los Angeles, where he successfully developed and re-sold numerous shopping centers, office buildings, residential apartment developments and other properties. Id. ¶ 5. In 2001, the defendant moved to New York. Transcript, 6/1/05 ("Tr."), at 7.

Joseph Bobker has four adult sons, Eli, Ben, Avi, and Dov, but only Ben and (very recently) Eli have followed him into the real estate business.[1] The Bobker family has established two New York corporations -- Millennium Assets, LLC ("Millennium"), in 1996, and Bluebell Assets, LLC ("Bluebell"), in October of 2001. Affidavit of Ben Baruch Bobker, 7/17/03 ("Ben Bobker Aff."), attached to Hyams Decl. as Exhibit G, ¶ 4; Tr. at 102. Ben Bobker previously attested that both companies are owned equally by all four brothers, see Ben Bobker Aff. ¶ 5, but at the evidentiary hearing he stated that he incorporated Bluebell as its sole owner. Tr. at 103. In any event, he has always been the manager of both companies and is solely responsible for their day-to-day activities. Ben Bobker Aff. ¶ 5. Eli Bobker is the sole owner of a closely related company called

---

[1] Eli, Ben and Avi are all attorneys. Affidavit of Ben Baruch Bobker, 7/17/03, attached to Hyams Decl. as Exhibit G, ¶¶ 3-4. Eli worked full-time for the New York law firm of Cadwalader, Wickersham & Taft from April of 1999 until his recent move to part-time status, Tr. at 83, while Avi continues to work full-time for the law firm of Debevoise & Plimpton. Id. ¶ 5. Dov is a full-time rabbinical student in Baltimore. See Deposition of Eli Bobker, 4/9/03, at 12.

2

Checkmate Holdings ("Checkmate"), which has only become active in the past year or so, as Eli has moved from full-time legal work to part-time real estate activity. Tr. at 83-84. It is apparent that the activities of Bluebell (the most active of the three companies), Millennium (which has seen little activity since Bluebell's founding) and, now, Checkmate, are closely coordinated.

While Ben Bobker states that he began working in the real estate field in 1996, Deposition of Ben Bobker ("Ben Bobker Dep."), 9/14/04, at 10, he provides no specifics as to his experience in the industry prior to his father moving to New York in 2001.[2] In the absence of such specifics, the Court concludes, notwithstanding the formation of Millennium Assets in 1996,[3] that Ben Bobker could not have played a major role in the family's real estate ventures prior to 2001. Until 1997, he was either attending Johns Hopkins University in Baltimore or studying in Israel toward a degree in Talmudic law. Ben Bobker Dep. at 8, 10; Tr. at 104. He became a full-time law student at Cardozo School of Law in New York in 1998, graduating in 2001. Id. At this point he was 24 or 25 years old. See Tr. at 102.

---

[2]At the hearing, Ben Bobker said that, before 1998, he "had introduced an investor" or "had been looking for more properties," but that his real estate work "didn't really take off from a more part-time to full-time capacity until later on, probably in 1998," when he moved to New York. Tr. at 104. Because Ben Bobker also entered law school at that time, and because no evidence as to his real estate activities at that time has been introduced, the Court finds it implausible that he was working in real estate full-time as early as 1998.

[3]There has been no evidence introduced showing that Millennium has ever conducted any meaningful activity.

3

While the litigation against defendant Joseph Bobker was pending in California, defendant took what the Court concludes were steps intended to try to insulate himself from an anticipated adverse judgment by, among other things, relocating to New York. On January 24, 2001, Eli Bobker purchased a house at Wildacre Avenue in Lawrence, New York (the "Wildacre property") in the name of a trust comprised of defendant Joseph Bobker's four sons (the "Bobker Family Trust"). See Indenture, attached to Hyams Aff. as Exhibit M. In March 2001, shortly before judgment was formally entered against him in California, defendant Joseph Bobker moved to New York.[4] Tr. at 7. Since then, he has resided at the Wildacre property.[5] The property has been extensively renovated over the past four years, at a cost of about $800,000. Tr. at 21. It is now valued at over two million dollars. Tr. at 6.

Bluebell, which was incorporated soon after Joseph Bobker moved to New York, quickly became a tremendously successful real estate venture. While neither side has introduced corporate balance sheets, the Court, based on evidence plaintiff has introduced as to

---

[4] While Joseph Bobker has not been consistent in this account, see Bobker Aff. ¶ 1 (stating that he has "resided permanently" in New York "since early in the year 2000"), this is the most likely scenario, since he has always resided in the Wildacre property.

[5] In 2002, plaintiff sued defendant, as well as Eli Bobker as trustee of the Bobker Family Trust, in New York state court, alleging that the Wildacre property was beneficially owned by Joseph Bobker and should be available for enforcement of the judgment. See Verified Complaint, attached to Declaration of Robert J. Howard, 3/4/05, as Exhibit A. This issue is not before the Court in this case.

4

the profitability of certain individual deals,[6] finds that the company's profits have exceeded $1 million per year since 2001 and are likely to continue to do so.

Much of this income has been used to pay defendant Joseph Bobker's personal expenses, often directly out of Bluebell's corporate funds, see Tr. at 11. The bills for credit cards in the name of defendant and his wife go directly to Bluebell's corporate offices. Id. at 13. If defendant or his wife need a check, such as for car payments, Ben Bobker signs a blank check on either Bluebell's account[7] or that of the Bobker Family Trust. Id. at 14, 81-82. Ben Bobker often does not know the purpose of the check or even to whom it will be made out, although he is informed of the check's amount so that he knows how much is in the account. Tr. at 112.

Defendant acknowledges that, in this fashion, Bluebell paid about $155,000 per year in living expenses for him and his wife, see Expense Schedule, Defendant's Exhibit A; Tr. at 16. This figure does not include the mortgage payments on defendant's house, which are also paid in this fashion and which amount to an additional $65,000 per year, see Expense Schedule. Defendant thus admits to having $220,000 in annual expenses paid in this fashion. Additionally,

---

[6] For example, Ben Bobker acknowledged profits for individual deals of: $300-400,000, see Ben Bobker Dep. at 26; of about $500,000, id. at 134; of about $500,000, id. at 136; of $300-400,000, id. at 160; of $200-230,000, id. at 161; of $350-400,000, id. at 167; and of $1.6 million, id. at 236-37.

[7] Eli and Ben Bobker claimed that these checks were paid out of company profits that otherwise would be dispersed to the brothers and were not accounted for as business expenses of Bluebell. Tr. at 89.

5

$800,000 in Bluebell funds were used to renovate defendant's home (which, the Court finds, was done at the behest of defendant or his wife). Tr. at 21; see Plaintiff's Exhibits 1 & 2 (photographs showing transformation of Wildacre property).

These conceded figures very probably underestimate the reality of the monies defendant receives from Bluebell. In particular, the figure of $155,000 in yearly expenses is based on a schedule prepared by defendant's wife (who did not testify at the hearing) that on its face appears problematic.[8] See Tr. at 48, 66. For example, the category "Insurances" lists $19,000 for 2003 but only $12,200 for 2004, but defendant could not explain if or why the premiums had dropped. Tr. at 68. Furthermore, he was unsure whether medical insurance was part of this category, whereas he was certain the category did include life insurance policies on both him and his wife. Tr. at 68, 78. Indeed, he did not rule out the possibility that his medical insurance, which (given his claim of persistent poor health) should include very high premiums, is covered by Bluebell as if he were a standard employee and thus is not included in his schedule at all. Tr. at 79. Furthermore, regardless of insurance, the line item called "Medical," which ranges between $500 and $1800 annually, is clearly too low.

---

[8]Defendant's wife Miriam operates as the bookkeeper both for the family and for the real estate ventures, a function she began performing in California. Bobker Aff. ¶ 20. Neither side introduced evidence as to the reasonable value of the services she provides.

6

In addition, the schedule excludes certain known items because of the defendant's (or his wife's) very selective notion of what constitutes his expenses. In particular, in order to honor a commitment made years ago by the defendant personally, Bluebell pays about $80,000 per year to maintain a life insurance policy on the lives of Frank McHugh and Christina O'Donovan, two residents of California who are not related to the Bobkers. See Tr. at 156; Application for Life Insurance, attached to Plaintiff's Letter Brief of June 8, 2005 ("June 8 Letter") as Exhibit A. Almost 90 percent of the policy's benefits of $8.6 million are currently due to be paid to UJEF, LLC, a California corporation owned solely by Joseph Bobker, and defendant retains the right to redirect those benefits at will. About seven and a half percent of the benefits are irrevocably committed to one Yale Butler, with the remainder irrevocably committed to Ner-Israel Rabbinical College. See 1999 Policy Service Application, attached to June 8 Letter as Exhibit E; Corporate Records Report, attached to June 8 Letter as Exhibit F.[9]

The Court notes, in passing, that in respect to this policy, as elsewhere, the defendant's testimony was evasive and incredible. Thus, the defendant maintained that the policy was properly left off the expense list because it was an act of charity that did not benefit him or his wife. This would be faulty logic in any case, since any charitable contribution remains the defendant's personal

---

[9]While under New York law, it may be doubtful that defendant had a sufficient insurable interest to make this policy lawful, the Court expresses no opinion as to its validity under California law.

7

expense so long as he is the one directing the payment. More generally, however, defendant's tortured explanations of this item speak volumes about his overall lack of candor.

Thus, the defendant initially explained that the policy was taken out, at the urging at Mr. McHugh, to benefit "several" Jewish charities, with some money to go to his children.[10] Tr. at 127. Defendant first said he had made Yale Butler a beneficiary as an act of charity because Butler had three sick children and was losing his business. Id. at 157. However, he then acknowledged that he had made Butler a beneficiary in exchange for ownership of a newspaper, having given Butler the choice of accepting cash instead. Id. at 157-58.

Defendant also testified that when he and his wife could no longer afford to make payments on the policy, they "passed it over to [their] children and told them to make the payments." Id. at 127. He said he and his wife "get no benefit... out of this policy whatsoever." Id. Recalled to the stand after the Court expressed skepticism as to his credibility, defendant clarified that 85 to 88 percent of the benefits would go to the Bobker Family Trust, with the remainder going to "third-party groups." Id. at 151. He said he

---

[10]While there is no evidence that the policy has ever benefitted defendant's children, the lion's share of the benefits initially were assigned to the defendant as trustee of Camp Mesorah, Inc. See 1997 Policy Service Application, attached to June 8 Letter as Exhibit C. Camp Mesorah is a California corporation, of which defendant is the president, and whose corporate status was suspended in 2000 for failure to pay corporation taxes. See Corporate Records Report, attached to June 8 Letter as Exhibit D.

8

"advised" his sons that continuing to make payments on the policy was "a great investment opportunity," but "they're free to stop making payments anytime they want." Id. at 152. However, no evidence was introduced indicating that, in fact, the beneficiary had been changed to the Bobker Family Trust, and defendant acknowledged that his wife was the person who continued making out checks (pre-signed by Ben Bobker) to pay the premiums.[11] Id. at 154. And even if defendant had changed the policy to list his children as beneficiaries, unless that assignment were made irrevocable (which defendant has not claimed), defendant would be free to reassign the benefits as desired.

The Court concludes that the $80,000 per year that is paid to sustain this policy is entirely for defendant's benefit. His failure to list the policy on his expense schedule and his willingness to mislead the Court once confronted with it undermines any confidence the Court might possibly have had in that schedule as an accurate depiction of the full extent of defendant's actual expenses that are paid by Bluebell. In addition, Ben Bobker testified that his parents sometimes ask him to wire Bluebell money directly to banks in Israel, without telling him the reasons for these transfers. Tr. at 133. It seems unlikely that these transfers fit into any of the schedule's categories, either. The Court concludes that defendant's annual

---

[11] Ben Bobker demonstrated little understanding of the policy's details and purpose, although he stated that he believed he and his brothers were the beneficiaries. Tr. at 115-18. Defendant acknowledged that the tale he spun in Court about the "genesis of the policy originally arising out of the charitable activities" was not one he had ever told Ben Bobker or his brothers. Id. at 152.

9

expenses paid by Bluebell are considerably greater than the $220,000 that has been disclosed.

The Court also cannot credit defendant's contention that he has played little part in Bluebell's success. The Bobkers portray him as merely an occasional consultant, with Ben Bobker performing most of the work. Defendant has submitted a list that he claims constitutes the entire set of deals to which he contributed. See Fees Earned by Joe Bobker, Defendant's Exhibit C. He asserts that, as a mere "finder" of deals, he "earned" commissions of one to four percent of the total value of each deal, totaling $486,000 through November 2004, the last date on which he claims to have performed work. See Tr. at 14. However, defendant never actually collected these fees. Where another company paid him by check, he endorsed the check over to Bluebell. Id. Where Bluebell would have been responsible for paying him, it simply credited the money he had "earned" in its books against the much larger sums Bluebell had paid for his expenses, in effect retroactively classifying that much of the expense payments, previously considered gifts, as compensation for work performed. Id. at 15, 105-11.

Defendant's account that his contribution to the family business is limited to the role of finder in the deals that appear on his list is rejected.[12] Considering that his "finder's fees" largely

---

[12]The Court accepts the testimony of the Bobkers and of their expert Mitchel LaBar that, if defendant's role were confined to being an occasional "finder" of deals, the level of his commissions would comport with the market rate for finders. See Tr. at 100, 198. However, it is clear that the defendant does much more on behalf of the real estate businesses than any finder

10

amount to an accounting fiction, with no money ever passing into defendant's hands; that the defendant has been actively avoiding payment on plaintiff's judgment; that defendant's living expenses are picked up by Bluebell; and that Ben Bobker is aware that he is not formally permitted to pay his father anything (as a result of a state restraining order), see Ben Bobker Dep. at 252, defendant has no motive to negotiate for or claim all the money to which he might be entitled were these arms-length transactions, instead of arrangements with his sons.[13] Moreover, since the defendant has failed to file income tax returns during this time, Tr. at 15, he has no corroboration for his calculations.

In addition, it is abundantly clear that defendant is no mere finder of deals. To begin with, it is implausible that Ben Bobker, immediately following his law school graduation, began landing deals valued in the millions of dollars and assembling complex plans for construction and resale without substantial assistance. Indeed, on Bluebell's first transaction, known as the Eighth Avenue Park Slope deal, the general contractor insisted that Joseph Bobker personally guarantee a $1.2 million construction loan to Bluebell, despite the defendant's supposedly not being a party to the deal and supposedly having no assets or income. Id. at 62. As defendant acknowledged,

---

would.

[13] While the Bobkers maintain that defendant intends to "repay" the money paid out for his expenses by "earning" commissions that are booked against such expenses, there is no requirement that his "earnings" ever reach the level of his expenses, as there would be if the expense payments were simply loans and not income. See Tr. at 90-92, 105-11.

11

in light of Ben Bobker's inexperience, that contractor "looked to me for my expertise and track record and knowledge to make sure that it would all come together." Id. at 64. Defendant further admitted that, with respect to all the deals he finds, he takes "a very active interest," including meeting with architects, brokers, lenders and other people essential to the deal's closing. Id. at 58-59. These undisputed facts alone indicate that he should not be treated as if he were a mere outside broker.

In addition, the evidence shows that defendant has played, and continues to play, a substantial role in ventures for which he does not claim a "commission."

For example, defendant did not list a project known as South 4th Street among those for which he earned a fee. However, in a prospectus describing the property, the Bobkers list defendant as part of the "team assembled to oversee the project." See Project Summary, Plaintiff's Exhibit 3. The prospectus also includes a letter from an architect thanking defendant "for the opportunity for the architectural work" on the property, id., thus indicating defendant's specific involvement in retaining him. In addition, defendant signed the purchase agreement for the property, personally guaranteeing the seller against damage to the seller's restaurant during construction. Purchase Agreement, attached to Hyams Decl. as Exhibit K.

To give another example, this past Spring defendant engaged in heated talks with a real estate broker named Lisa Bornstein, who apparently thought she was owed a commission for her work related to

12

the South 4th Street property and who consequently had already sued the Bobkers. Tr. at 33-34. Defendant faxed Bornstein a draft civil complaint in which he indicated that he was prepared to sue her for treble damages under RICO. See Draft Complaint, Plaintiff's Exhibit 4. This draft complaint lists defendant and Ben Bobker as plaintiffs and states that they "work together in the business of real estate development through a number of business entities."[14]  Id. ¶ 6.  On May 16, 2005, defendant sent Bornstein an e-mail, telling her he would move "full speed ahead" on the lawsuit if she did not settle the suit she had filed against the Bobkers. He told her that he was "judgement proof and thus unintimidated by your lawsuit." See E-Mail of May 16, 2005, Plaintiff's Exhibit 5. Ben Bobker was unaware that his father was sending this e-mail. Tr. at 141. These exchanges indicate that defendant, despite claiming he had not been able to work since last November because of illness, has been taking the lead in dealing with litigation involving at least this venture.

By way of still another example, plaintiff also introduced evidence that defendant has worked on another property, on Quentin Road in Bensonhurst, that was not among those for which defendant claimed a "commission." Defendant took out a full-page advertisement

---

[14] Defendant asserts that, despite the fact that he implicitly adopted the statements in the draft complaint by sending it to his litigation adversary, many of the "facts" alleged in it are, he now admits, false. See Tr. at 36. Accordingly, the Court receives these statements only partly as an admission by the defendant of his considerable role in the real estate ventures, and partly as one more indication of the defendant's readiness to make false or misleading statements at all times.

13

offering to sell this property and listing his phone number.[15]  See
Advertisement, Plaintiff's Exhibit 6; Tr. at 43.  While denying that
he performed any other work with respect to the Quentin Road
property, defendant acknowledged that he "spoke to the broker once or
twice to get comps in the neighborhood, just to make sure he was
doing the right thing."  Tr. at 44.

In addition, a feature published in a real estate trade
journal in December of 2002 described Bluebell as an extension of
defendant's California business, which had simply moved its
headquarters.  It extensively quotes Ben Bobker, "who runs the
company with his father Joe Bobker."  See GlobeSt.com Article,
attached to Hyams Decl. as Exhibit H.  Ben Bobker admitted that he
was interviewed for the article and that he provided the information
reported, but denied that he had told the reporter that his father
ran the company with him, Ben Bobker Dep. at 87-89, but the Court
infers otherwise.

Moreover, in some places defendant's testimony is
contradicted by that of his own sons.  For example, with respect to
the South 4th Street project, Ben Bobker admitted that his father
"developed" the project, see Ben Bobker Dep. at 146, including
negotiating to bring in third-party investors, id. at 150.  In
contrast, defendant stated that he "had no role" in the deal.  Tr. at
10.  Confronted with his son's testimony, defendant stated:  "I think

---

[15]Defendant claims he regularly puts advertisements in the
newspaper, not for the specific purpose of selling the listed
properties, but in hopes of "meet[ing] new people for the
purposes of finding more projects."  Tr. at 43.

14

my son is using the word 'develop' totally inaccurately." Id. at 11.
He said he "met the investor/buyer a couple of times" but denied that
he was "involved in the negotiations with the seller and the
investors." Id. at 27.

Against all this evidence, defendant's chief rebuttal is that
it would have been physically impossible for him to perform
significant work during the past few years. It is undisputed that,
while Ben Bobker maintains an office in New York City on behalf of
Bluebell, defendant mostly works from home and commutes into the
office only once a week. Tr. at 45. However, the Court attaches
little significance to this fact, which hardly rules out defendant's
performing considerable work while not in the office; indeed, the
defendant acknowledges that he calls the Bluebell office "every day."
Id. at 46  In addition, defendant claims that his ill health renders
his working ability questionable from day to day. Id. at 7. Indeed,
he claimed at the hearing that he had not "worked since last
November." Id. However, this was revealed to be inaccurate when
evidence was produced showing his recent involvement in the South 4th
Street litigation. Moreover, defendant has produced no hospital
records or doctor's reports to substantiate his self-serving story.
Given what it finds to be defendant's general propensity to mislead
and prevaricate, the Court cannot give any significant weight to this
account.

Having made these factual findings, the Court concludes that
an installment payment order must be entered against Joseph Bobker.

Under New York law,[16] a judgment creditor may seek an order requiring "specified installment payments" from a debtor upon a showing that either: (1) "the judgment debtor is receiving money or will receive money from any source," or (2) the debtor "is attempting to impede the judgment creditor by rendering services without adequate compensation." N.Y. C.P.L.R. § 5226. If the Court finds either showing made, in fixing the amount of the payments it must subtract "the reasonable requirements of the judgment debtor and his dependents." Id.

The Court finds, *first*, that defendant is receiving substantial income from Bluebell. Defendant has all his personal expenses paid in prompt and unquestioning fashion, and he has access both to a credit card and to signed blank checks. Defendant appears to have full control over how the money will be spent. There is no substantive difference between this arrangement and the direct receipt of cash in the same amount, which is at least $300,000 in untaxed income (the equivalent of over $400,000 had defendant received his income lawfully). The Court need not recognize the artificial form defendant has employed to evade his creditor. See Widder Bros. Inc. v. Kaffee, 19 A.D.2d 817, 817 (N.Y. App. Div. 1963) (upholding installment order that took account of, in addition to defendants' earnings, "emoluments" they received from corporations they "dominated"). Moreover, for purposes of this provision, which

---

[16]The procedure for enforcement of judgments in federal court "shall be in accordance with the practice and procedure of the state in which the district court is held," Fed. R. Civ. P. 69.

16

takes account of money received "from any source," gifts received with regularity are treated as income, and so it does not matter how much of the money that is spent on defendant's behalf he "earned." City of Albany Indus. Dev. Agency v. Garg, 268 A.D.2d 784, 786 (N.Y. App. Div. 2000).

Second, it is clear that defendant is attempting to impede his judgment creditor by rendering services without adequate compensation. Defendant acknowledges performing $486,000 worth of simple deal brokering over a three-year period between October 2001 and November 2004, which would value his services at roughly $150,000 per year. However, as described above, this figure substantially understates both the number of transactions in which the defendant was involved and his role in the transactions and in the overall workings of the business. Accordingly, the Court estimates that the reasonable value to the family real estate business of the services defendant performs is about $400,000 per year.[17] In any case, the best evidence as to the contributions defendant has made to the

---

[17]Plaintiff's expert, Allen C. Winters, estimated that someone running a small real estate company would earn roughly $500,000 per year, plus benefits. Tr. at 164. The Court adopts a somewhat lower figure as attributable to Joseph Bobker, because the evidence shows that Ben Bobker, while relying heavily on his father, nevertheless is now running the company in certain respects. Since the company's profits exceed $1 million per year, it would not be unreasonable to assume that Joseph Bobker would get $400,000 and Ben Bobker the higher figure of $600,000 or more. The Court rejects defendant's argument that plaintiff must show that defendant could obtain employment elsewhere at such a salary, as the statute does not require such proof.

business is the money the company indirectly pays him, an analysis that, not coincidentally, yields a similar figure.[18]

Third, the Court has taken account of defendant's *reasonable* requirements, which bear little resemblance to the opulent lifestyle he currently enjoys. It is the defendant's burden to establish such reasonable requirements. See Camphill Special Sch., Inc. v. Prentice, 126 Misc. 2d 707, 708 (N.Y. Sup. Ct. 1984); Dickens v. Dir. of Fin. of the City of New York, 45 Misc. 2d 882, 883 (N.Y. Sup. Ct. 1965). While the defendant has attested to various expenditures regularly made on his behalf, he has not shown to the Court's satisfaction that any of them are reasonable requirements, as opposed to luxuries. See Yamamoto v. Costello, 73 Misc. 2d 592, 597 (N.Y. Sup. Ct. 1973). Accordingly, the Court does not attempt to fix with specificity defendant's reasonable requirements, except to conclude that they are a small fraction of current expenditures.

Fourth, having considered all the required factors, and exercising its wide discretion in this area, see Binder v. Schenk, 30 A.D.2d 596, 596 (N.Y. App. Div. 1968), the Court sets defendant's annual payments at $100,000, to be paid in monthly installments of

---

[18]The Bobkers contend that defendant's expenses would be paid regardless of how much he contributed to the companies, simply as a matter of sons taking care of their father, and that any amount defendant manages to contribute in return is welcome but not in the nature of a quid-pro-quo. See Tr. at 96. However, regardless of how these transactions are characterized on Bluebell's books or even in the Bobkers' own minds, the inference is unavoidable that the lifestyle for which Bluebell pays bears a close correlation to the defendant's activities on behalf of the company, a relationship that is ordinarily called "payment for work rendered."

18

$8,333 until defendant has satisfied his debt to plaintiff. Based on the money defendant has "earned" over the past four years, it might well be reasonable to set payments considerably higher (although perhaps not at more than $400,000 annually, as urged by plaintiff). However, Section 5226 is worded in terms of what a debtor "is" doing or "will be" doing, not what he has done in the past.[19] Despite some skepticism as to the defendant's claims about his health and about the volatile nature of his business, the Court has taken into account his argument that his ability to pay will fluctuate. Therefore, the payment level is a conservative one, which the defendant can have no excuse for failing to pay each month.

Accordingly, for the reasons stated above, defendant is hereby ordered to make installment payments to plaintiff of $8,333 per month, commencing with a first payment on September 1, 2005, until the entire judgment, including accruing interest, is satisfied.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
August 17, 2005

---

[19] By contrast, plaintiff's related case against defendant, Lowy v. Bobker, 05 Civ. 3431 (JSR), seeks damages for the past behavior not only of defendant but of his family. That case, which has been stayed pending the resolution of this one, will resume shortly. The Court expresses no opinion as to the collateral estoppel effects in that case of the facts it has found herein.